Edward Johnson, OSB #96573
Monica Goracke, OSB #06065
OREGON LAW CENTER
921 SW Washington #516
Portland, OR 97205
Phone (503) 473-8310
Fax (503) 295-0676
edjohnsonolc@yahoo.com
mgorackeolc@yahoo.com

      Of Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| MARY MACQUIRE<br><br>    Plaintiff,<br><br>vs.<br><br>CITY OF GRESHAM,<br>JEFF DURBIN and<br>TED VAN BEEK<br><br>    Defendants. | Case No: 07-919-MO<br><br>**PLAINTIFF'S TRIAL MEMORANDUM** |

Plaintiff submits this brief to assist the court with such legal issues as may arise during the trial of the above captioned matter.

## INTRODUCTION

Plaintiff Mary MacQuire brings this suit against Defendant police officer Jeffrey Durbin based upon his use of excessive force in violation of her Fourth Amendment rights. She also sues Officer Durbin's employer, the City of Gresham, for its inadequate training and policies regarding the police's use of force.

1      PLAINTIFF'S TRIAL MEMORANDUM

## CONTENTIONS OF FACT

On the morning of April 7, 2006, at approximately 7:00 a.m., Ms. MacQuire was in her ex-boyfriend's tent off of the Springwater Trail in Gresham, Oregon, in an area known locally as "the Swamp." Ms. MacQuire's ex-boyfriend, Greg Schultz, was at that time homeless and spending the nights in the Swamp. Defendant Jeffrey Durbin and Officer Ted Van Beek, Gresham police officers, routinely engaged in "focused patrols" of the Swamp with the purpose of removing homeless people camped in the area. Durbin and Van Beek were on such a patrol on the morning of April 7, 2006.

Durbin and Van Beek approached the area off of the Springwater trail where approximately four tents were visible. As the officers entered the Swamp, they announced their presence and told anyone present to come out of the tents. Greg Schultz came out of his tent. A verbal exchange took place between the officers and Schultz regarding Schultz' right to camp in the area. As Schultz and the officers argued, Ms. MacQuire, upon instruction from the police, tied a pit-bull puppy belonging to her and Schultz to a tree nearby. As she tied up her dog, the argument between Schultz and the police escalated. Schultz engaged in some name-calling with Defendant Durbin, whom he knew from previous interactions. Schultz was placed under arrest and handcuffed without resisting. As Ms. MacQuire turned back toward Schultz and the Officers, she saw Officer Van Beek push Schultz to the ground and pin him there. Defendant Durbin kicked Schultz several times while Schultz was handcuffed and pinned to the ground by Officer Van Beek.

Ms. MacQuire walked toward Schultz, Durbin and Van Beek and told the officers that they could not treat Schultz in this manner and asked for their business cards. Defendant Durbin

approached Ms. MacQuire and told her that she was under arrest and that he was not giving her his business card. Durbin grabbed Plaintiff by her left arm and put that arm behind her back. While holding onto Plaintiff's arm, Defendant Durbin punched her with his fist several times in the stomach.

At about this time, Officer Van Beek instructed Defendant Durbin to "take her down."[1] Defendant Durbin grabbed Ms. MacQuire by the hair and slammed her into the ground, pushing her face to the ground. After Defendant Durbin slammed Plaintiff to the ground, Plaintiff's arm was pinned beneath her and Defendant Durbin was on top of her with his knee in her lower back. Defendant Durbin repeatedly slammed his knee into her lower back with his full weight on top of her.

Without warning, Defendant Durbin electrically shocked Plaintiff with his Taser gun at least four times on her upper thigh and hamstring while she was pinned beneath him with her face on the ground. The Taser used was an X26 model manufactured by Taser International, Inc. The X26 supplies electrical shocks of 50,000 volts at five second intervals when the trigger is pulled in the drive stun mode, the method used on Ms. MacQuire in this incident.

After he had handcuffed Ms. MacQuire, Defendant Durbin rolled her over and began choking her with his hands. Throughout his assault on Plaintiff, Defendant Durbin said out loud, "stop resisting." Ms. MacQuire only wanted the beating and tasing to stop and was not resisting. During the beating she repeatedly said, "please stop, I'm not resisting." Defendant Durbin, while choking Plaintiff, told her that he could kill her.

---

[1] Van Beek testified at his deposition that Schultz had somehow gotten up at this point and was heading toward MacQuire and Durbin. No one else saw Schultz get up.

As a consequence of Defendants' actions, Plaintiff suffered severe physical and emotional distress. The extreme use of force and the administration of the Taser shock were unreasonable, unnecessary, malicious and done with reckless or deliberate disregard for Plaintiff's well-established constitutional right not to be subjected to an unreasonable seizure of her person.

The City of Gresham has failed to train, supervise and discipline its police officers properly with respect to the use of force and Taser shock. The City of Gresham's policy with regard to Taser shock is unconstitutional. It places the drive stun Taser application at the same level of force as control holds, joint manipulation and the use of pressure points, even though the Taser, in fact, is a significantly higher use of force than these other methods of force and poses a significantly higher risk of injury and pain to the person being tased. The Gresham Police Department (GPD) policy gives officers no guidance whatsoever as to when it is or is not appropriate to use the Taser. The City of Gresham's failure to train and supervise as well as its unlawful policy regarding Taser shock contributed directly to the damages sustained by Plaintiff.

## LEGAL ISSUES

**1.      Excessive Force**

The Fourth Amendment protects "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . ." U.S. Const. amend IV. The Fourth Amendment requires police officers making an arrest to use only the amount of force that is objectively reasonable in light of the circumstances facing them. *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7-8 (1985). Further, "even where some force is justified, the amount actually used may be excessive." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002). The proper inquiry is whether the intrusiveness of the seizure, including

the officer's choice of aggressive tactics, was "a reasonable response to legitimate safety concerns." *Washington v. Lambert*, 98 F.3d 1181, 1185-86 (9th Cir. 1996)(emphasis omitted).

In *Blanford v. Sacramento County,* the Ninth Circuit described the reasonableness standard under *Graham* as follows:

> "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396 . . . . This balancing test entails consideration of the totality of the facts and circumstances in the particular case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*.

406 F.3d 1110, 1115 (9th Cir. 2005). Similarly, in *Jackson v. City of Bremerton*, the court determined that "the reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. 268 F.3d 646, 651 (9th Cir. 2001) quoting *Graham*, 490 U.S. at 396. Even though "[n]ot every push or shove, even if it may later seem unnecessary in the peace of the judge's chambers violates the Fourth Amendment. . . [i]n evaluating the nature and quality of the intrusion, [a court] must consider the type and amount of force inflicted in [making an arrest]." *Id.* at 651-52 (citations and internal quotations omitted).

Taken as a whole, the facts of this case clearly indicate that Officer Durbin used an excessive amount of force on Ms. MacQuire. Plaintiff does not dispute that the actions of Schultz may have been inappropriate and may well have provoked the use of force against him. However, Officer Durbin's punching, take-down, kneeing, tasering and choking of Ms.

5        PLAINTIFF'S TRIAL MEMORANDUM

MacQuire were entirely disproportionate to any threat posed by her or Schultz. There is an ample basis for the jury to find a violation of Ms. MacQuire's Fourth Amendment rights to be free from excessive force or an unreasonable seizure. See *Graham*, 490 U.S. at 397 (noting that the inquiry is the objective reasonableness of the force used). The parties agree that this fact question should be decided by the jury.

**2.     Qualified Immunity**

Defendant Durbin has asserted that even if Ms. MacQuire proves that he used excessive force against her, he is entitled to qualified immunity for his actions on April 7, 2006. For the reasons set out below, he is not.

In *Saucier v. Katz*, The Supreme Court clarified the two-part test to be used in deciding whether qualified immunity shields a government official from liability for constitutional injuries. 533 U.S. 194 (2001). A court deciding questions of qualified immunity first analyzes whether "the facts alleged show that the officer's conduct violated a constitutional right." *Id*. at 201. If the allegations are found to make out a cognizable constitutional injury, the court's next task is to determine whether the constitutional right alleged to have been violated was "clearly established" such that no reasonable officer could have reasonably but erroneously believed that his conduct did not violate the plaintiff's rights. *Id*. at 202; *see also, Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001).

Defendant Durbin is not entitled to qualified immunity for his actions in this case. No reasonable police officer in Defendant Durbin's position could have believed that he could repeatedly punch MacQuire, slam her to the ground, repeatedly shock her with a Taser and choke her without provocation or justification, without violating her Fourth Amendment right not to be

subjected to excessive force or an unreasonable seizure.  There is no legitimate dispute that the Fourth Amendment right asserted by Plaintiff – not to be subject to excessive force by the police – has been "clearly established" for decades.

Defendant Durbin may argue that, while the general right not to be subject to excessive force has been recognized for decades, the use of a Taser in these circumstances did violate any "clearly established" right.  Plaintiff asserts that even if this were true, it could not provide Defendant Durbin with the cloak of qualified immunity because it does not justify his use of punches, a hair take down, pummeling with his knee, choking and threats of death.  In addition, the manner of Taser use in this case -- repeatedly on an unarmed woman who posed no safety threat to him – did violate Plaintiff's "clearly established" rights.

To demonstrate that her rights was "clearly established" by law on April 7, 2006, Ms. MacQuire need not show that the exact facts of her case have been litigated:  "Specific binding precedent is not required to show that a right is clearly established for qualified immunity purposes.  Absent binding precedent, a court should look at all available decisional law including decisions of state courts, other circuits and district courts to determine whether the right was clearly established." *Doe by and through Doe v. Petaluma City School Dist.* 54 F.3d 1447, 1450 (9th Cir. 1995).  See also *Kelley v. Borg* 60 F.3d 664, 667 (9th Cir. 1995) (noting that the level of particularity with which a right must be "clearly established" does not include all of the particular facts in the case at hand because such narrow particularization would "define away all potential claims.")

This principle makes sense in light of the unique factual circumstances of excessive force cases. Taking Defendant Durbin's version of the facts of this case alone, there are multiple

7         PLAINTIFF'S TRIAL MEMORANDUM

separate "uses of force" to be evaluated: (1) he delivered four or five diversionary blows to Ms. MacQuire's stomach; (2) he took her to the ground by her hair; (3) he pinned her to the ground with his knee and (4) he tased her at least four separate times.  Each of these "uses of force" involves unresolved factual issues to be determined by the jury in analyzing whether the force used was excessive.  Ms. MacQuire's version of the facts adds (1) Defendant Durbin pummeling her with his knee in her back; (2) him choking her and (3) him threatening her.

Based upon Ms. MacQuire's version of the facts, a jury could readily conclude that (1) she did not pose a threat to the officers or anyone else; (2) she could not reasonably have been perceived as being a threat and (3) Officer Durbin's use of force, including at least four 50,000-volt Taser shocks lasting at least five seconds each, was objectively unreasonable and unnecessary.  Therefore, at its most specific, the proper question with regard to whether qualified immunity applies in this case is whether a reasonable officer in Defendant Durbin's position would know that his actions, taken collectively, violated Ms. MacQuire's rights.  Ms. MacQuire asserts that any reasonable officer would have known that this conduct violated Ms. MacQuire's clearly established rights.

Even taken in isolation, Defendant Durbin's use of the Taser on MacQuire violated her clearly established rights.  The right to be free from the unreasonable use of Tasers has long been a clearly established right in this Circuit.  See *Michenfelder v. Sumner*, 860 F.2d 328, 336 (9th Cir. 1988) (in prisoner control case, the Ninth Circuit found that unnecessary use of Tasers for purposes of "punishment or the infliction of pain" would violate clearly established rights).  Likewise, prior to April 7, 2006, the Ninth Circuit repeatedly recognized that the use of force on a subdued arrestee was unreasonable.  *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir.

1998); *Mendoza v. Block*, 27 F.3d 1357, 1362 (9th Cir. 1994);

      More recently, several United States District Courts have found, based upon factually similar incidents that occurred prior to April 7, 2006, that unnecessary Taser use violates a "clearly established" right to be free from excessive force and creates a triable issue of fact for the jury.  While some of these decisions were issued after April 7, 2006 (the date to determine, in this case, whether a "clearly established" right existed) all of them evaluated whether a "clearly established" right existed on a date prior to April 7, 2006.  See *Rios v. City of Fresno,* 2006 U.S. Dist. LEXIS 85642, *27-33, 54-60 (E.D. Cal., Nov. 14, 2006) (arrestee shot by a Taser, on March 20, 2004, generated triable excessive force question despite defendant raising qualified immunity defense and evidence that plaintiff was belligerent, uncooperative, displaying frustration and anger and pulled his arms away from officers, refusing to be handcuffed); *Beaver v. City of Federal Way*, 2006 U.S. Dist. LEXIS 83097, *1-5 (W.D. Wash., Nov. 3, 2006) (arrestee who claimed to have been shocked eight times by Taser, on August 24, 2004, generated triable excessive force question when he adduced evidence that his movements while on the ground after being initially shocked by the Taser were, and could reasonably have been perceived to have been, results of confusion from intoxication and pain from initial Taser shot rather than indicia of active resistance to arrest); *Harris v. County of King*, 2006 U.S. Dist. LEXIS 67752, *1-3, *6-11 (W.D. Wash., Sept. 21, 2006) (arrestee generated triable excessive force question when he adduced evidence based upon an incident that took place on June 30, 2003,  that despite his arguable earlier "active resistance" to arrest, he had fully complied with officers' orders and had his back toward them and hands up in the air when two officers shot him with Tasers in the back causing him extreme pain); *Hudson v. City of San Jose*, 2006 U.S. LEXIS 26760, *8-14

9      PLAINTIFF'S TRIAL MEMORANDUM

(N.D. Cal., April 27, 2006) (arrestee generated triable excessive force question when he adduced evidence of an incident that took place on July 11, 2004, that despite continuing to grip the officer's arm after he and the officer had fallen to the ground, arrestee was pinned underneath officer, who had "pretty much" detained him, and arrestee therefore was not "necessarily resisting with sufficient force and efficacy that it was reasonably necessary to use a Taser– or a baton – on him."); *Richards v. City of Yakima*, 2007 U.S. Dist. LEXIS 77929, *17 (E. D. Wash., Oct. 17, 2007) (On date of incident, July 23, 2005, "the law at the time of [the] conduct clearly established that a Taser must not be used against a non-resisting individual."); *Parker v. City of South Portland*, 2007 U.S. Dist LEXIS 37015, *77-89 (D. Me., May 18, 2007) (arrestee generated triable excessive force question based upon a traffic stop on July 20, 2005, where he adduced evidence that despite being a large, muscular, intoxicated and frustrated arrestee who made some movements indicating a willingness to resist, that the use of a Taser against him was not necessary or objectively reasonable); *DeSalvo v. City of Collinsville*, 2005 U.S. Dist. LEXIS 23180, *4-5, *11-15 (S.D. Ill., Oct .7, 2005) (arrestee generated triable excessive force question based upon an incident that took place on September 3, 2004, when he adduced evidence that officer tased him on the neck solely because he persisted in asking why he was being arrested, and why another man was being arrested. The court also noted that Taser shock is "a significantly violent level of force.").

     In summary, the law regarding Taser use as of the morning of April 7, 2006 was "clearly established" in two important ways. First, the seriousness of Taser use was well established. Second, unreasonable or unnecessary use of a Taser against an arrestee was deemed to violate clearly established rights of the arrestee to be free from excessive force. Accordingly, Defendant

Durbin's claim of qualified immunity must be denied.

3.   **Municipal Liability**

Local governments are "persons" subject to suit for "constitutional torts" under 42 U.S.C. § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 n.55 (1978). In general, a local government can be held liable for its official policies or customs. However, it will not be held liable for an employee's actions outside of the scope of these policies or customs. Plaintiff does not deny that some of Defendant Durbin's actions, *e.g.*, choking Ms. MacQuire while she was handcuffed, were outside of any Gresham policy. However, other actions, such as the initial use of the Taser on MacQuire without exhausting less dangerous and painful options, may have been taken within Gresham's written "use of force" policies. It is well established that a single constitutional violation may create §1983 liability under *Monell* if the cause of the violation was a clearly unconstitutional municipal policy adopted by the city or its policy makers. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985); *Ruvalcaba v. City of Los Angeles*, 167 F.3d 514, 523-24 (9th Cir. 1999) (plaintiff's single-incident evidence was enough to raise issue of fact as to connection between City's dog bite policy and officer's striking and kicking plaintiff).

To prevail on a § 1983 claim against the City of Gresham under *Monell*, Ms. MacQuire must establish three independent elements: (1) a violation of her constitutional rights; (2) the existence of a municipal policy or custom; and (3) a causal nexus between the policy or custom and the constitutional violation. *Monell*, 436 U.S. at 690-92.

Ms. MacQuire's *Monell* claim is straightforward and is based on Defendant Durbin's use of the Taser on her. Ms. MacQuire concedes that other aspects of Defendant Durbin's use of excessive force – punching, pummeling, choking, threatening -- have no causal nexus to

11      PLAINTIFF'S TRIAL MEMORANDUM

Gresham police policy. With regard to the Taser use alone, however, Ms. MacQuire can satisfy the three elements and assert a clear claim of municipal liability.

      a.     **The Constitutional Violation**

Using the above-cited *Graham v. Connor* "totality of the circumstances" test**,** Ms. MacQuire must show that Defendant Durbin's use of force on her amounted to excessive force. In the *Monell* context, the more specific issue for the jury is whether the tasering in this case was reasonable under all of the circumstances. The facts will not show Defendant Durbin's Taser use to be reasonable in this case. By the time the Taser was employed, Ms. MacQuire posed no risk to him or anyone else. She was not committing any crime. She was lying beneath Defendant Durbin. He weighed nearly one-hundred pounds more than her. She was unarmed and trapped beneath his full weight. Defendant Durbin made no effort to handcuff her by using control holds. His repeated use of the Taser under these circumstances was not necessary or reasonable. Durbin's use of the Taser on Ms. MacQuire violated her Fourth Amendment rights.

      b.     **The City Policy**

There are three distinct methods or bases for establishing a city "policy or custom" under § 1983 jurisprudence: (1) city regulations, (2) "failure to train" and (3) city customs. *Monell*, 436 U.S. at 690-91. In this case, Ms. MacQuire relies on (1) GPD use of force polices and (2) GPD's failure to train its officers as the bases for her *Monell* claim. Gresham's written Taser policy and the placement of Taser use on the "continuum of force" are clear, written city policies. Additionally, Gresham has failed to adequately train its officers, including Defendant Durbin regarding proper Taser use.

A Taser policy that has significant flaws and gaps can raise a fact issue as to municipal

liability. *McKenzie v. City of Milpitas*, 738 F. Supp. 1293, 1301 (N.D. Cal. 1990). GPD's entire written policy on Taser use reads as follows:

> "ELECTRONIC RESTRAINT DEVICE: Officers who have been trained in the use of the Electronic Restraint Device shall be allowed to carry and deploy the device. The use of the Electronic Restraint Device is considered *physical control* in the contact application and *serious physical control* in the projectile application."

As indicated, Gresham places the contact application or drive stun use of the Taser (the one used on Ms. MacQuire) in the "physical force" category on the continuum of force. This category also includes control holds, joint manipulation and the use of pressure points, even though the Taser, in fact, is a significantly higher use of force than these other methods of force and poses a significantly higher risk of injury and pain than the other methods of force in the "physical force" category.

The Gresham Use of Force Policy states that officers are authorized to use *physical force*, "to bring an unlawful situation safely and effectively under control." It also states that "[o]fficers shall use only the level of force reasonable and necessary to accomplish the lawful objective." This vague statement can be of little use to officers on the job because Taser use has been categorized in the same level of force as routine control holds. The GPD "Use of Force" policy in effect as of April 7, 2006 included a "Force Continuum." This document authorizes drive stun Taser use for all types of resistance – ominous, active or static. On its face, it authorizes officers to use a Taser against a suspect even if that person poses no actual or perceived threat to the officers or anyone else. Looked at in its totality, GPD's Use of Force Policy gives officers no guidance whatsoever as to when it is or is not appropriate to use the Taser.

13      PLAINTIFF'S TRIAL MEMORANDUM

In addition to the unconstitutional Taser policy, GPD failed to train their officers adequately on the use of Tasers. In order for the City of Gresham to be liable for a "failure to train," Ms. MacQuire must show more than negligence on the City's part, she must show that the City's failure amounts to "deliberate indifference." *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989). The Ninth Circuit has found that a jury may find that a municipality has made such a "deliberate choice" when a municipal actor disregarded "a known or obvious consequence of his actions." *Gibson v. County of Washoe*, 290 F.3d 1175, 1194 (9th Cir. 2002). The question of whether a municipality has displayed a deliberate indifference to the constitutional rights of its citizens is generally a jury question. *Id*. at 1194-95.

The Gresham Police Department has shown deliberate indifference in its omissions regarding the training of its officers. GPD training offers no more information about when to use various methods of force within a given category than the written policies. Sergeant Jeff Hansen, one of the people responsible for the GPD Taser training and Use of Force Policy, testified in his deposition that there is no training or policy that tells GPD officers when a control hold might be appropriate versus the use of the Taser in drive-stun mode: "It's what an officer feels is most appropriate at the time." Hansen Depo. at 19.

In addition, GPD has not changed its policy or training in light of significant publicly available information regarding the risk of Taser use. Sgt. Hansen, for example, was unaware at the time of his deposition that police officers around the country have sued Taser International, Inc. for injuries sustained after volunteering to be tased during a training. Hansen Depo at 30, line 16. Likewise, Hansen was unaware that the United Nations has recently declared the X26 Taser to be a form of torture. Hansen Depo at 30, line 19. Instead, GPD relies on Taser

14      PLAINTIFF'S TRIAL MEMORANDUM

International, Inc, the manufacturer of the X26, for informational updates related to Tasers. Hansen Depo. At 30-31. This lack of initial training coupled with the complete lack of updated training or policy change in light of readily available information about the X26 Taser can only be fairly seen as "deliberate indifference" to the rights of people in Gresham who may have the Taser used on them by untrained officers.

    **c.**    **Causation**

Finally, Ms. MacQuire must convince the jury that the above policy and failure to train caused, at least in part, her constitutional deprivation. Given the above facts and the evidence in the record a jury could easily reach such a conclusion. For example, Defendant Durbin will testify that he believed that he was following the GPD's taser policy when he repeatedly used his Taser on Ms. MacQuire. Given the significant inadequacies of this policy, a jury could certainly conclude that the constitutional violation, at least in part, was directly attributable to GPD's constitutionally flawed policy and training.

**4.**    **Plaintiff's Damages**

    **a.**    **Compensatory Damages**

Where there is evidence of physical injury caused by excessive force, the jury should return some award of compensatory damages. *Atkins v. New York City*, 143 F.3d 100, 103 (2d Cir. 1998). In addition, defendants take the plaintiff "as is," which means that the "eggshell skull" doctrine applies. *Lutz v. U.S.*, 685 F.2d 1178, 1186 (9th Cir. 1998).

In addition to the pain and physical injuries that she suffered, Ms. MacQuire contends and will testify that she has suffered substantial emotional distress, fear, anxiety and humiliation as a consequence of Defendants' actions. Testimonial evidence alone is sufficient proof to support an

award of emotional distress damages. *Chalmers v. City of Los Angeles*, 762 F.2d 753, 761 (9th Cir. 1985) (upholding emotional damages award based solely on plaintiff's testimony that she suffered humiliation, embarrassment and anxiety); *Johnson v. Hale*, 13 F.3d 1351, 1352 (9th Cir. 1994) (noting that emotional damages may be awarded based on testimony alone or appropriate inference from circumstances); see also *Carey v. Piphas*, 435 U.S. 247, 264 (1978) (noting that emotional distress damages are essentially subjective and may be proven by reference to the injured party's conduct and observations by others).  The nature of the testimony sufficient to sustain an award of damages for mental distress may be as simple as testimony that the plaintiff believed and felt she was treated unfairly as a result of defendant's conduct.  See, e.g., *Jones v. Los Angeles Community College District*, 702 F.2d 203, 207 (9th Cir. 1983) (the court determined that the record supported the finding that plaintiff suffered mental and emotional distress because plaintiff believed the defendant treated her unfairly).

      b.      **Punitive Damages**

Plaintiff is entitled to claim and be awarded punitive damages against Defendant Durbin. Punitive damages "serve to punish the defendant for wrongful conduct and to deter the defendant and others from repeating that wrong." *Dang v. Cross*, 422 F.3d 800, 810 (9th Cir. 2005); see also *Copper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001).  Plaintiff is entitled to punitive damages if the jury finds any of the following: (1) Defendant Durbin acted with malicious intent; *Smith v. Wade*, 461 U.S. 30, 46 (1983); (2) Defendant Durbin acted recklessly or with callous indifference to plaintiff's constitutional rights; *id*. at 51; or (3) Defendant Durbin acted oppressively.  *Dang*, 422 F.3d at 809.

Malicious, wanton or oppressive acts or omissions are within the boundaries of traditional

tort standards for assessing punitive damages and foster deterrence and punishment over and above that provided by compensatory awards. *Smith v. Wade*, 461 U.S. at 45, n.12. Wanton misconduct is "an act or omission in reckless disregard of another's rights, coupled with the knowledge that injury will probably result." *Dang* 422 F.3d at 809, n.8 (citation omitted); *see also, McKinley v. Trattles*, 732 F.2d 1320, 1326 n.2 (7th Cir. 1984) (The court gave the following jury instruction: "An act or a failure to act is wantonly done if done in reckless disregard or callous disregard of or indifference to the rights of one or more persons including the injured person."). The Ninth Circuit has approved of a similar jury instruction stating that an act is oppressive, however, "if done in a manner which injures or damages or otherwise violates the rights of another person with unnecessary harshness or severity as by misuse or abuse of authority or power or by taking advantage of some disability or the misfortunes of another person." *Fountila v. Carter*, 571 F.2d 487, 493 (9th Cir. 1978).

  Once Defendant Durbin could see that Ms. MacQuire posed no threat to him or to others, he must have been aware that his ongoing and extreme use of force against her would cause her severe pain, physical injury and lasting emotional harm. Durbin's repeated blows and Taser shocks to Ms. MacQuire as she was lying beneath him, helpless and unarmed, perfectly fit the definition of oppressive conduct. Defendant Durbin's conduct when he choked Ms. MacQuire and told her that he could kill her, after she had been handcuffed, can only fairly be described as malicious in nature.

  Punitive damages are largely the realm of the jury and the Ninth Circuit has repeatedly shown great deference to a jury's decision-making authority. A jury's award of punitive damages is not to be lightly disturbed. *See Kennedy v. Los Angeles Police Dep't*, 901 F.2d 702,

17  PLAINTIFF'S TRIAL MEMORANDUM

707, n.3 (9th Cir. 1989)(overruled on other grounds). Defendants in this matter will not be able to meet their burden of demonstrating that the Plaintiff cannot prove significant facts in support of her claim for punitive damages.

          OREGON LAW CENTER

          s/ Edward Johnson
          Edward Johnson, OSB #96573
          Monica Goracke, OSB #06065

          Of Attorneys for Plaintiff